**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| ESTATE OF GERALD A. WIEGERT, | : | |
| | : | |
| *Plaintiff,* | : | Case No. 1:23-cv-234 |
| | : | |
| v. | : | Judge Jeffery P. Hopkins |
| | : | |
| AMERICAN AEROMOTIVE CORPORATION, | : | |
| | | |
| *Defendant.* | | |

## OPINION AND ORDER

The Estate of Gerald A. Wiegert ("Plaintiff" or "the Wiegert Estate") is suing Defendant American Aeromotive Corporation ("Defendant" or "AAC") in this proceeding. Both entities share a passion for supercars—in fact, they share a passion for one particular brand of supercar that goes by the name of Vector. The Vector brand was notable for producing performance automobiles in the latter decades of the 20th century. Gerald Wiegert created Vector automobiles and was the driving force behind the company. Since his passing in 2021, Nava Wiegert, his daughter and administrator of his estate, has sought to carry forward her father's legacy. In a similar spirit, AAC was founded by David Sawyer. He, too, has dedicated significant time and effort to reviving various models of supercars under the Vector name. While both parties, the Wiegert Estate and AAC, raced toward a similar destination—ownership and control of the Vector brand or trademark—each eventually came to see the other as a roadblock. The parties negotiated to avoid a collision over rights to the Vector trademark, yet just as they appeared poised to cross the finish line, AAC swerved, and the discussions aimed at reaching an agreement unraveled and this litigation ensued.

Thereafter, the Wiegert Estate sued AAC for breach of contract. Compl., Doc 1. In the Complaint, the Wiegert Estate seeks primarily to enforce the terms of what it claims was an agreement reached between the parties to settle the trademark cancellation proceeding which had been initiated by AAC in the U.S. Patent and Trademark Office's Trial and Appeal Board ( the "TTAB"). *Id.* AAC, on the other hand, denies that there was ever any meeting of the minds between the parties and asserts that no settlement was ever reached over who would retain ownership or use of the Vector trademark. After filing the Complaint, the Wiegert Estate filed a Motion for Settlement Enforcement ("the Wiegert Estate's Motion for Settlement Enforcement"). Doc 8. In response, AAC filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction and for Summary Judgment ("AAC's Motion to Dismiss"). Doc 17. A hearing on the motions was held on January 18, 2024, after which the parties were directed to engage in further settlement discussions. After the impasse persisted, on January 27, 2025, the Court entered an Order scheduling a settlement conference before Chief Magistrate Judge Bowman which also did not bear fruit. Doc. 34. The motions filed by the parties are now ripe for determination.

For the reasons expressed below, the Court **DENIES** AAC's Motion to Dismiss (Doc. 17) and **GRANTS** the Wiegert Estate's Motion for Settlement Enforcement (Doc. 8).

## I. BACKGROUND

For nearly two decades, AAC's owner, David Sawyer, has been on a quest to own the Vector brand marks. As far back as May 2001, Sawyer, through his company AAC and its

2

affiliates[1], purchased the names and marks of the Vector Aeromotive Corporation. Doc. 18-1, PageID 265–68. Even still, questions remained about AAC's right to use the Vector name at that time. *Id.* at PageID 262. Fast forward to the year 2021. As noted, in 2021 AAC instituted proceedings before the TTAB asserting that the Wiegert family and their affiliates had abandoned the Vector mark. *Id.* In turn, on February 17, 2022, the TTAB entered a default judgment for AAC. *Id.* at PageID 390. Subsequently, however, after the Wiegert Estate caught wind of this and filed a petition requesting review, the TTAB re-opened the matter for further consideration setting aside the default. *Id.* at PageID 262.

The proceeding before the TTAB led to an attempt at reconciliation between the parties. With the TTAB proceeding on pause, Nava Wiegert, the daughter and administrator of the Wiegert Estate, directed her attorney Natalie Remein to submit a letter offering settlement terms of the dispute to AAC's legal counsel, Jaci Overmann. Doc 8-1, PageID 108. That letter was delivered on March 3, 2023. *Id.* The letter proposed that the Wiegert Estate pay $50,000 to AAC to end the "feud." *Id.* at PageID 113. The letter also endorsed AAC's use of the M-12 model name and stated that the "M-12 is not within our scope of interest as it is not a Wiegert manifestation." *Id.* In a subsequent phone call on March 9, 2023, between Remein and Overmann, a deal was ostensibly reached. *See* Doc. 8-1, PageID 108. Speaking on behalf of AAC, Overmann reportedly stated "we accept" in reference to the settlement offer contained in the March 3 letter sent at the direction of Nava Wiegert. *Id.* On that same call, Remein suggested the agreement be reduced to writing, and Overmann offered to take

---

[1] Sawyer previously formed another company, DAS Corporation (DAS), which later assigned its assets to AAC. *See* Doc. 18-1, Page ID 260. Jose Canaan is a part-owner of AAC who submitted a declaration and testified briefly at the January 18, 2024, hearing on the parties' opposing motions. *See* Doc. 18-2, PageID 402.

3

the first stab at drafting. *Id*. Nothing in the record indicates that the attorney for either party explicitly reserved acceptance until the agreement had been drafted and signed, nor was there any indication that any other terms or conditions remained open for further negotiation other than the ones proposed in the phone call.

The events that occurred next happened in rapid succession. On March 14, 2023, five days after the parties' attorneys had spoken, as she had promised, Overmann drafted a written version of the agreement memorializing the terms which had been negotiated and emailed it to Remein. Compl., Doc. 1-1, Ex. A-2, PageID 16. The material terms of the agreement included three promises by AAC: (1) to not use the "VECTOR Mark," (2) to dismiss the cancellation proceedings it had begun at the TTAB, and (3) to withdraw its application for the Vector trademark. As consideration, Nava Wiegert was obligated to make a one-time payment of $50,000 to AAC. *Id*. at Ex. A-3, PageID 20. Responding on March 15, 2023, one day later on behalf of the Wiegert Estate via email, Remein edited the draft to make two changes. First, a clarification that AAC must not attempt to register the Vector mark, and second, that the payment due date be set for 7 to 10 days after the effective date of the contract, rather than being a static date of March 23. *Id*. at Ex. A-6, PageID 31. On that same day, shortly after receiving the amended version of the original draft, Overmann emailed Remein, responding to the edits stating, "these are fine." *Id*. at Ex. A-5, PageID 27.

Following the attorneys' exchange of the original and edited drafts, on March 20, 2023, Remein transmitted to Overmann the finalized version of the parties' written agreement, incorporating the edits made by Remein. *Id*. at Ex. A-7, PageID 36. As promised, the final draft of the agreement also contained Remein's client, Nava Wiegert's signature. *Id*. at PageID 41. Thereafter, things slowed down. Over the next three weeks, the Wiegert Estate

awaited AAC president David Sawyer's signature on the document. During that time, AAC's attorney, Overmann, reported to Remein that the "[o]nly hold up on my end is logistical/scheduling." *Id.* at Ex. A-8, PageID 43. Then, in a sudden turn of events, on April 7, 2023, Overmann contacted Remein to inform her that "[David Sawyer] does not wish to sign the settlement and is not in agreement" and that AAC as plaintiff in the proceedings before the TTAB was intent on renewing its efforts at cancellation of any ownership rights in the Vector mark held by Wiegert. *Id.* at Ex. A-11, PageID 50. At this point, despite the progress the attorneys had made towards settling the TTAB Vector trademark litigation, the parties reached an impasse.

Thereafter, the Wiegert Estate filed this action against AAC seeking: (1) to enforce the terms of the parties' alleged settlement agreement resolving the cancellation proceedings and related disputes between them; (2) an order for a preliminary and permanent injunction enjoining and restraining AAC, and all persons acting in concert with it, from using the VECTOR Mark or any mark or designation confusingly similar thereto as agreed to in the alleged settlement; (3) an order directing AAC to pay the Wiegert Estate the amount of damages it allegedly sustained as a result of AAC's alleged breach of the agreement and any and all appropriate compensatory and other damages caused by AAC in violation of the common law, and; (4) an order requiring AAC to pay the Wiegert Estate, to the full extent recoverable under all applicable law, attorney's fees, costs, and interest incurred in connection with this action, among other items. Compl., Doc. 1.

## II. STANDARD OF REVIEW

### A. The Wiegert Estate's Motion to Enforce Settlement Agreement

Prior to addressing the substance of both parties' motions, the Court must first determine whether they should be converted into cross motions for summary judgment. Regarding the Wiegert Estate's Motion to Enforce Settlement Agreement, the term "settlement agreement" is a misnomer. The "settlement agreement" ("the Agreement") was proposed in an effort to curtail a trademark cancellation proceeding before the TTAB. Compl. Doc. 1-1, Ex. A-3, PageID 19. The Agreement did not arise from litigation occurring within this Court. Therefore, the Complaint correctly originates under the Court's diversity jurisdiction as a breach of contract action. *See Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 381–82 (1994) (holding that when the court has not retained jurisdiction under prior litigation, the cause of action must originate under an "independent basis for federal jurisdiction"). Thus, the function of the Motion to Enforce Settlement is to request that the Court enforce the contract which the Wiegert Estate claims has been breached by AAC. This amounts to a request for the Court to render judgment on the cause of action listed in the Complaint, and the Court will construe it as such.

### B. AAC's Motion to Dismiss and for Summary Judgment

The Court next considers AAC's Motion to Dismiss. Rule 12(d) provides that if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). The Sixth Circuit has clarified that under Rule 12(d), if matters outside the complaint are presented with a motion to dismiss, courts "must expressly exclude outside-the-complaint materials or convert the motion to one for summary judgment." *Cotterman v. City of Cincinnati, Ohio*, No.

21-cv-3659, 2023 WL 7132017, at *4 (6th Cir. Oct. 30, 2023) (citing *Max Arnold & Sons, LLC v. W.L. Hailey & Co.*, 452 F.3d 494, 503 (6th Cir. 2006)) (emphasis omitted). Thus, a district court has "discretion either to exclude this outside information (and treat the motion as a motion to dismiss subject to Rule 12's standards) or to consider the information (and treat the motion as a summary-judgment motion subject to Rule 56's standards)." *Id.* (citing *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010)).

Under Rule 12(d), if matters outside the pleadings are presented to and not excluded by the Court, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). In this case, both parties rely on matters outside the pleadings and on evidence adduced at the hearing held on January 18, 2024; accordingly, "neither party will be surprised or prejudiced by the conversion to a Rule 56 motion." *Stringer v. Nat'l Football League*, 474 F. Supp. 2d 894, 914 (S.D. Ohio 2007). The issue before the Court is centered on the validity of the Agreement, which is included in the record, testimony from a hearing on the pending motions on January 18, 2024, and other documents attached to the motions and their briefs. The Court will consider these materials in reviewing this matter and will therefore treat both the Wiegert Estate and AAC's motions as motions for summary judgment under Rule 56.

## C. Summary Judgment Standard

That brings the Court to the appropriate standard on cross motions for summary judgment. Summary judgment is warranted if a "movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant "'always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions' of the record which

demonstrate 'the absence of a genuine issue of material fact.'" *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

The non-movant cannot defeat summary judgment merely by pointing to any factual dispute. Indeed, the "'mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'" *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). A fact is *material* if its resolution affects the outcome of an action, and a dispute is *genuine* if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. At bottom, the Court must determine whether there is some "sufficient disagreement" that necessitates submitting the matter to a jury. *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52).

As here, when reviewing cross-motions for summary judgment, courts should "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). Accordingly, "[t]he fact that one party fails to satisfy [its] burden on his or her own Rule 56 motion does not automatically indicate that the opposing party or parties has satisfied their burden and should be granted summary judgment on the other motion." *Fed. Energy Regul.*

8

*Comm'n v. Coaltrain Energy, L.P.*, 501 F. Supp. 3d 503, 522 (S.D. Ohio 2020). Furthermore, "[t]he filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (quoting *John v. State of La. (Bd. of Trs. for State Colls. & Univs.)*, 757 F.2d 698, 705 (5th Cir. 1985)). In short, the standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Id*.

### III. LAW AND ANALYSIS

#### A. Jurisdiction

The first issue before the Court is whether subject matter jurisdiction exists to hear this case. The diversity of the parties is not contested as this case involves a dispute between citizens of different states—the Wiegert Estate, a California entity and AAC, a Florida company with a principal place of business in Ohio. *See* Compl. Doc. 1, ¶ 4; *see also* Doc. 7, ¶ 4. Instead, AAC contends that the $75,000 requirement is not met because the amount in controversy, *i.e.*, the amount to be paid by the Wiegert Estate as consideration under the Agreement, was only $50,000.

"[I]t is well established that federal courts are courts of limited jurisdiction, possessing only that power authorized by the Constitution and statute." *Hudson v. Coleman*, 347 F.3d 138, 141 (6th Cir. 2003) (citations omitted). In accordance with 28 U.S.C. § 1332(a), district courts have original jurisdiction over cases between citizens of different states where the "matter in controversy exceeds the sum or value of $75,000." 28 U.S.C. 1332(a). The burden is on the party invoking federal court jurisdiction to demonstrate "by competent proof that the

complete-diversity and amount-in-controversy requirements are met." *Cleveland Hous. Renewal Project v. Deutsche Bank Tr. Co.*, 621 F.3d 554, 559 (6th Cir. 2010) (citing *Hertz Corp. v. Friend*, 559 U.S. 77, 96–97 (2010)). And the party bearing that burden must establish that it is "more likely than not" that the amount in controversy exceeds $75,000. *Id.* at 560. "In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation" *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977). When boiled down to the fundamentals, the object of the litigation here involves the contracted right to own or control the Vector trademark.

Here, the Wiegert Estate has met its burden. The Complaint alleges loss of business opportunity in excess of $75,000 as a result of AAC's contract breach. Compl., Doc. 1, ¶ 5. In her original offer letter addressed to AAC's president David Sawyer, Nava Wiegert referenced the Wiegert Estate's plans to use the Vector trademark to "relaunch VECTOR and original Wiegert-designed models." Compl., Doc. 1-1, Ex. A-1, PageID 14. In her declaration, Ms. Wiegert detailed that these plans involved a licensing agreement with a partner company valued in excess of $75,000. Doc. 19-1, PageID 486–87. These statements are supported by the declaration of Francesco Aglietti, CEO of Dexet Technologies, who planned to enter the licensing agreement with Ms. Wiegert. In his declaration, Aglietti states that the licensing agreement would include a "six-figure upfront payment plus royalties" leading to a total "which would be in the seven figures." Doc. 19-2, PageID 551. Based on Aglietti's declaration testimony, the Court finds that it is more likely than not that the object of the litigation—ownership or control of the Vector trademark—has a value exceeding $75,000. As a result, it is entirely proper for this Court to exercise diversity jurisdiction. The case involves citizens of different states; the object of the litigation is to obtain injunctive relief

to enforce a contract reached between them; the contract concerns the exclusive right to own, use, and perhaps license the Vector trademark in the construction of supercars; and according to the uncontroverted evidence presented, that trademark has an attested value well above § 1332(a)'s $75,000 threshold. Under the circumstances, the relatively low burden of proof needed to satisfy the monetary requirement has been met. *See Hunt*, 432 U.S. at 347. Thus, AAC's attempt to dismiss this case for lack of subject matter jurisdiction must be rejected.

### B. Breach of Contract

Having established that diversity jurisdiction exists, the Court turns to the central dispute in the case—the Wiegert Estate's claim that AAC breached the Agreement. Federal courts sitting in diversity must apply the forum state's substantive law—here, Ohio. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Thus, to establish a breach of contract claim under Ohio law, the Wiegert Estate "must prove, by a preponderance of the evidence, 'the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff.'" *LifeBio, Inc. v. Eva Garland Consulting, LLC*, 682 F. Supp. 3d 692, 701 (S.D. Ohio 2023) (quoting *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) (other citations omitted).

### 1. Authority to Enter into Settlement

While not directly addressed in the briefs, the legal issue of delegation of authority was indirectly raised by Sawyer, AAC's president, in his testimony at the hearing on January 18, 2024. Hearing Tr., Doc. 30, 137:10–138:22. As a result, the Court feels it pertinent to clarify the law as it pertains to this issue and the facts of this case before addressing the merits of the Wiegert Estate's breach of contract claim. The question arises: did the attorneys, and in

11

particular, Overmann, have authority from AAC to enter into a settlement of the TTAB proceedings which now gives rise to the contract dispute before this Court?

Ohio law has enforced settlements negotiated by client-authorized attorneys, even if the settlement terms are rejected by their clients after the fact. One court has aptly stated the rule in Ohio: "[i]f an attorney settles a client's claims without having been given authority to discuss settlement with opposing counsel, that settlement is not enforceable. However, if an attorney is given authority to negotiate a settlement, but settles the client's claims on terms unacceptable to the client, such a settlement is enforceable despite the client's lack of consent." *Patel v. Lowes Home Centers, Inc.*, No. 2:05-CV-775, 2007 WL 544049, *6 (S.D. Ohio Feb. 16, 2007) (citations omitted); *see also Kraras v. Safeskin Corp.*, No. 2:98-CV-169, 2004 WL 2375525, *8 (S.D. Ohio Aug. 26, 2004) (holding that by retaining attorneys and authorizing them to enter into settlement negotiations, the attorneys "had authority to bind [client] to a specific sum even if [client] did not agree to that settlement"); *see also Argo Plastic Products Co. v. City of Cleveland*, 474 N.E.2d 328, 331 (1984) (finding a $500,000 settlement to be enforceable because the city authorized its attorney to negotiate the city's claims, although the city only authorized a $2,500 settlement).[2] Finally, "authorization for an attorney to settle a client's claim need not be express, but may be ascertained from the surrounding circumstances." *Elliot v. Gen. Motors Corp.*, 72 Ohio App.3d 486, 488 (1991); *see also Rubel v. Loire's Home Ctrs., Inc.*, 597 F. Supp. 2d 742, 745 (N.D. Ohio 2009).

---

[2] The policy reasons supporting this rule are well-established: "But for this rule of law, prudent litigants could not rely on opposing counsel's representation of authorization to settle. Fear of a later claim that counsel lacked authority to settle would require litigants to go behind counsel to the opposing party in order to verify authorization for every settlement offer." *Patel,* 2007 WL 544049 at *5.

Based on the Ohio law cited, the issue here is whether the client, AAC or its president David Sawyer, in light of the surrounding circumstances, authorized AAC's attorney, Jaci Overmann, to engage in settlement negotiations with the Wiegert Estate's counsel, Natalie Remein. At the time of the negotiations, there were no indications that Overmann's authority had any boundaries. Sawyer claims now that he understood the Agreement would not be effective until he approved and signed it. Hearing Tr., Doc. 30, 114:16–18. The Court has carefully scrutinized Sawyer's testimony from the hearing. Conspicuously absent from Sawyer's testimony is any denial that he authorized Overmann to negotiate with Remein on behalf of himself or AAC, or that he *expressly* placed limitations on Overmann's authority to enter a settlement. Nor is there anything in the record indicating that Overmann ever informed her counterpart in the negotiations, Remein, of any limits on her authority, or that by orally accepting the settlement offer during the March 9 call that acceptance was contingent on Sawyer's approval. Indeed, all the facts suggest quite the opposite. And unlike Remein, who testified at the hearing and whose declaration is part of the record, Overmann has made no appearance whatsoever in the case to contradict these facts. One thing appears certain, however; Overmann engaged in some form of settlement negotiations with Remein on March 9 and the days immediately following concerning the Vector trademark dispute between the Wiegert Estate and AAC happening in the TTAB.  Further, those negotiations occurred during the critical period after the default judgment in the TTAB proceedings was vacated and before Overmann gave notice to Remein that the trademark cancellation proceedings in the TTAB would be resumed.

The "surrounding circumstances" strongly suggest that Overmann was authorized to negotiate the settlement on AAC's behalf. *Elliot*, 72 Ohio App.3d at 488. Not only did Sawyer

13

and Overmann discuss the letter sent by Nava Wiegert offering AAC $50,000 to terminate the cancellation proceedings over the Vector trademark in the TTAB, but Sawyer was also aware that Overmann would be resuming negotiations with Remein towards reaching an agreement with the Wiegert Estate over its proposal to settle the TTAB litigation for $50,000—after the two had discussed the letter. Hearing Tr., Doc. 30, 112:22–114:9. Finally, and importantly here, one cannot overlook the fact that AAC's attorney Jaci Overmann is the one who memorialized the settlement agreement in writing, rather than allow it to simply remain as oral understanding. Indeed, Overmann voluntarily took an active role in drafting the Agreement. She did not simply act as an intermediary relaying verbal and email communications to her client. These factors all strongly evince authorization on Overmann's part to negotiate the Agreement without any imposed limitations. As previously stated, no record evidence directly contradicts this understanding. Therefore, the only conclusion that a jury can reach is that Overmann was duly authorized by AAC to enter negotiations to broker a settlement with the Wiegert Estate based on the terms that had been proposed by Nava Wiegert in the letter which formed the basis of the Agreement. Having clarified the preliminary issue of authority, the Court now turns to the central issue of the case—and that is whether a valid contract was indeed formed.

### 2. Existence of a Contract

The Court must determine whether the Agreement between the parties attached to the Complaint is a valid contract. "Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration. A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract."

14

*Minster Farmers Coop. Exch. Co. v. Meyer*, 2008-Ohio-1259, ¶ 28 (citations omitted). The dispute in this case concerns whether mutual assent and a meeting of the minds occurred during the phone call between the parties' authorized legal representatives on March 9, 2023 and the subsequent exchange of emails between the attorneys proposing modest but agreed upon changes.

Clarity in the terms of an agreement is a strong indication that a meeting of the minds has occurred. Enforceability "depends on whether the parties have manifested an intention to be bound by [the] terms and whether these intentions are sufficiently definite to be specifically enforced." 17 Ohio Jur. 3d Contracts § 14. The terms of the agreement must "establish an objective meeting of the minds, which is to say that the contract [is] clear and unambiguous." *216 Jamaica Ave., LLC v. S & R Playhouse Realty Co.*, 540 F.3d 433, 440 (6th Cir. 2008). An objective standard means that "[s]ecretly held, unexpressed intent is not relevant to whether a contract is formed." *Nilavar v. Osborn*, 127 Ohio App. 3d 1, 12 (1998), *modified on reconsideration* (May 12, 1998). It is also noteworthy that Ohio courts have recognized that "expressions of assent are generally sufficient to show a meeting of the minds." *Rudd v. Online Res., Inc.*, No. 17500, 1999 WL 397351, at *5 (Ohio Ct. App. June 18, 1999).

An incomplete attempt to reduce the agreement to writing does not disprove a meeting of the minds has occurred, especially where parties have not expressly reserved finalization. "The existence of a valid agreement is not diminished by the fact that the parties have yet to memorialize the agreement. When the parties have agreed on the essential terms of a settlement, and all that remains is to memorialize the agreement in writing, the parties are bound by the terms of the oral agreement." *RE/MAX Int'l, Inc. v. Realty One, Inc.*, 271 F.3d 633, 646 (6th Cir. 2001) (applying Ohio law). Even where settlement terms are reached

15

through negotiation, but signature is refused on a finalized written agreement, Ohio courts have found that the initial agreement does not lose its binding force. *See Turoczy Bonding Co. v. Mitchell*, 2018-Ohio-3173, ¶ 21–23 (8th Dist.); *see also Swan v. Villas Condo. Unit Owners' Assn*, 2024-Ohio-2313, ¶ 26 (1st Dist.). In those cases, the court was persuaded by the absence of an express statement that the agreement would not become binding until it was formally executed. *Id*.

Returning to the matter before this Court, the March 9 phone call established clarity over the terms of the Agreement, and neither parties' attorney made an express reservation of finalization—meaning neither attorney stated that the Agreement would only become binding when reduced to writing and approved by their respective clients. The attorney negotiating for the Wiegert Estate, Natalie Remein, testified that AAC's counsel, Jaci Overmann, called in response to the offer for a settlement and said, "we accept." Hearing Tr., Doc. 30, 25:1–6. "We accept" is a clear expression of assent. Conditions relating to the M-12 were not discussed on that call. *Id* at 26:2–4. Nor were any qualifications expressed as to the finality of the Agreement. *Id*.

Even though the Wiegert Estate's offer initiated the negotiation, terms were sufficiently clear that AAC's counsel, Jaci Overmann, elected to pen the initial written draft of the Agreement. *See* Compl., Doc 1-1, Ex. A, PageID 9. In her email, attaching the draft Agreement, dated March 14, 2023, sent only five days after the March 9 call between the two attorneys Overmann, on behalf of AAC, wrote, "Hi Natalie [Remein], As discussed, please find attached a draft settlement agreement for the matter. If you have any questions or concerns, please let me know. Otherwise, *we look forward to receiving an executed copy*. Best, Jaci [Overmann]." Compl., Doc 1-1, Ex. A-2, PageID 16. (emphasis added). One day later, on

16

March 15, the Wiegert Estate's counsel returned the agreement to Remein after making only minor and inconsequential edits. This is demonstrated by the fact that upon receiving the edits, attorney Overmann on behalf of AAC quickly responded, "[t]hese are fine" in an email sent only moments after receiving them. Compl., Doc 1-1, Ex. A-4, PageID 25. Nothing in this exchange provides any objective indication that more remained to be done to reach an agreement. Even a week later, when AAC had yet to sign, Overmann expressed that the "[o]nly hold up on my end is logistical/scheduling." Compl., Doc. 1-1, Ex. A-8, PageID 43.

AAC has produced no evidence at the hearing or in its Motion that an express reservation of finality was made during these negotiations. In a futile attempt to produce such evidence, AAC points to the fact that the Agreement as drafted references signature in establishing the effective date and the fact that the contract has a merger clause (also referred to as an integration clause) which states that the "Agreement may be executed by facsimile signature, or any electronic or scanned image." Compl., Doc. 1-1, PageID 40. Neither of these factors is relevant to determining whether there had previously been a meeting of the minds, as the following analysis demonstrates.

First, as the Court has already stated, the refusal to sign a finalized draft of the Agreement does not invalidate a previous meeting of the minds. *See Turoczy*, 2018-Ohio-3173, at ¶ 21–23 (8th Dist.); *see also Swan*, 2024-Ohio-2313, at ¶ 26 (1st Dist.). Determining the effective date is a minor clerical matter to establish a prompt date of payment, it is not a substantial term of the contract.

Second, the presence of a merger clause referencing signature on an unsigned written agreement does not demonstrate that the initial oral agreement was incomplete. A merger clause attempts to address the admissibility of parol *evidence* related to the oral agreement, it

is not related to the *finality* of the prior agreement. An oral agreement can be a complete enforceable agreement without being reduced to writing. A merger clause aims to establish a new written agreement which integrates the prior oral agreement into the formalized written one. The oral agreement thereby merges into the written agreement and becomes superseded by it. The purpose of a merger clause is to ensure that the written agreement "may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements." 43 Ohio Jur. 3d Evidence and Witnesses § 495. Thus, a failure to attain signature on a written agreement prevents the prior oral agreement from merging into the written agreement and being subject the parol-evidence rule. However, without completed merger, the prior agreement continues to stand on its own, and failure to merge changes nothing about the enforceability of the prior agreement.

Finally, AAC's subjective concerns about the M-12 do not prevent contract formation when they were not expressed. AAC's president David Sawyer, testified that the M-12 rights were a significant concern to him during the negotiations. Hearing Tr., Doc. 30, 116:25–117:4. However, AAC did not produce one scintilla of evidence to show that these concerns were expressed during the course of negotiations or exchanges of drafts between the attorneys in the effort to memorialize the oral agreement previously reached. Even when AAC's attorney, Overmann, drafted the initial written version of the Agreement, she included no language referring to the M-12. As stated before, a "[s]ecretly held, unexpressed intent is not relevant to whether a contract is formed." *Nilavar*, 127 Ohio App. 3d at 12. With no evidence in the record demonstrating an expression of this concern during the negotiation, Sawyer's testimony is not relevant to the legal determination of an objective meeting of the minds.

18

For purposes of analysis, AAC, the non-moving party with regard to the Wiegert Estate's Motion for Settlement Enforcement, has failed to produce evidence sufficient to create genuine doubt as to the formation of an agreement between the Wiegert Estate and AAC. Where the non-movant fails to produce evidence to create a "genuine issue of material fact," summary judgment is proper. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). The non-movant must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. The Sixth Circuit has remanded summary judgment over a settlement dispute for failure to conduct an evidentiary hearing to properly scrutinize "credibility of the affiants" and allow for cross examination. *Kukla v. Nat'l Distillers Prods. Co.*, 483 F.2d 619, 622 (6th Cir. 1973). Here, the Court has held an evidentiary hearing on the motions, presenting AAC with a full and fair an opportunity to adduce evidence of a material dispute of facts. The Court concludes, however, that AAC has failed to do so, and the oral agreement established that the evidence reflected a meeting of the minds between the parties.

Further, because the Court finds there exists a valid and enforceable agreement between the parties, there is no path forward for AAC to prevail on its Motion to Dismiss. In the Motion to Dismiss, AAC contends that it is entitled to judgment on the basis that (1) no enforceable agreement exists and (2) diversity jurisdiction is lacking. Doc. 18, PageID 242. For reasons expressed earlier in this opinion, the Court has rejected both of these arguments. Thus, AAC is not entitled to summary judgment as a matter of law.

### 3. Performance by the Plaintiff and Breach by the Defendant

Turning next to the remaining two elements of the Wiegert Estate's breach of contract claim which must be established, the Court's focus now shifts to: performance and breach.

The Wiegert Estate's obligation under the Agreement was to pay $50,000 to AAC. "The general rule is that a party seeking specific performance of a contract must show performance on his part; yet there are clearly defined exceptions, and one of them is that, when the other party repudiates and makes it certain that he does not intend under any circumstances to comply, a showing of readiness and ability on the part of the complaining party to then and there perform his part communicated to the other party, and accompanied with a demand of compliance by such other party, is sufficient compliance without an actual formal tender.'" *Unger v. Chaves*, 113 N.E.2d 753, 756 (Ohio Ct. App. 1953) (quoting *George Wiedemann Brewing Company v. Maxwell*, 84 N.E. 595, 597–98 (1908)).

Here, again, the record shows that the Wiegert Estate demonstrated readiness and ability to perform. On March 27, 2023, the Wiegert Estate's counsel, Remein, requested notification of finalization of the written agreement so her client, the Nava Wiegert, could "send the check." Compl., Doc. 1-1, Ex. A-9, PageID 46. This clearly demonstrates readiness and ability to perform on the part of the Wiegert Estate. Instead, however, on April 7, 2023, Overmann notified Remein of David Sawyer's decision to reject the settlement agreement negotiated by the attorneys and to renew AAC's trademark cancellation action before the TTAB, buttressed by its submitting of Requests for Production, Interrogatories, and Admissions. Compl., Doc 1-1. Ex. A-11, PageID 50. These actions were in violation of the terms of the Agreement the parties had reached and amounted to a repudiation and breach. Within three weeks, the Wiegert Estate filed this breach of contract action, which was tantamount to a demand for compliance. Thus, the second and third elements of a breach of contract action have been fulfilled, with no evidence in the record to dispute these facts.

### 4. Damage or Loss to the Plaintiff

As a result of AAC's breach, the Wiegert Estate has been unable to proceed with a licensing deal for the Vector brand that is reportedly worth at least a million dollars. *See* Doc. 19-2, PageID 551. This satisfies the element of damage or loss.

## IV. CONCLUSION

For all the reasons expressed, the Court **DENIES** AAC's Motion to Dismiss for Lack of Subject Matter Jurisdiction and for Summary Judgment (Doc. 17) and **GRANTS** the Wiegert Estate's Motion for Settlement Enforcement (Doc. 8). It is hereby **ORDERED** that the Agreement be enforced. The Court **ORDERS** the clerk to **ENTER JUDGMENT** in favor of the Wiegert Estate. The Wiegert Estate shall have 28 days from the date of this Opinion and Order to file a motion regarding any damages they seek. AAC shall have 21 days to file its response. The Wiegert Estate may file a reply 14 days thereafter. A hearing regarding damages may be scheduled upon further order of the Court.

**IT IS SO ORDERED.**

November 18, 2025

Jeffery P. Hopkins
United States District Judge